Filed 8/14/17

# CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO PINEDA, JR.,<br><br>    Defendant and Appellant. | B267885<br><br>(Los Angeles County<br>Super. Ct. No. TA133930) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Conditionally reversed, with directions.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Parts II.B–II.D; Justice Kriegler's concurring and dissenting opinion is certified for publication in full.

Deputy Attorney General, Allison H. Chung, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Armando Pineda, Jr. (defendant) guilty of second degree murder for shooting the patriarch of a neighboring family, Rogelio Islas (Rogelio).[1] Defendant was 17 years old at the time of the crime, and the Los Angeles County District Attorney directly filed the charge against him in a court of criminal jurisdiction, rather than a juvenile court. Owing to that filing decision and the subsequent repeal of "direct file" procedures effected by Section 4 of the Public Safety and Rehabilitation Act of 2016 (Proposition 57), we must decide an issue pending on our Supreme Court's docket: whether the changes worked by Section 4 apply to defendant because his conviction is not yet final. In the unpublished portion of our opinion, we also consider defendant's additional assignments of error: the trial court abused its discretion by denying his motion to continue the trial, the court should have instructed the jury on third party flight as consciousness of guilt (both defendant and his father fled the scene of the crime, and the defense at trial was that the father was the shooter), and the court should have given defendant's proposed pinpoint instruction on provocation as relevant to voluntary manslaughter.

## I. BACKGROUND

### A. *The Offense Conduct*

On several occasions during the two years that preceded Rogelio's killing, members of the Pineda family (i.e., defendant's family) and the Islas family (i.e., Rogelio's family) argued and, at times, engaged in fisticuffs. Both families lived on the same

---

[1] Many of the individuals involved in this case share the same last name. We use first names where warranted for clarity.

street in Compton (one house apart), and naturally, each family believed it was in the right and the other family was responsible for the ongoing trouble.

On the day defendant shot Rogelio in June 2014,[2] trouble began around 2:30 in the afternoon. Defendant, his girlfriend Katherine Bautista (Bautista), and his sister Connie had plans to visit another of defendant's sisters. They were preparing to leave for the visit in an SUV parked between the Pineda and Islas family homes. Defendant's father, Armando Pineda, Senior (Senior), had arrived home at about the same time, and he drove past Rogelio standing outside his home without incident.

According to Connie and others in the Pineda family, defendant was in the process of putting his child into a car seat in the SUV when Rogelio insulted defendant and both men then began arguing. Connie and Bautista attempted to convince defendant to stop arguing and get in the SUV—physically holding defendant back at one point. While defendant and Rogelio were arguing, Senior came outside.

The only eyewitnesses to what happened next were defendant and members of his family; they would later claim Senior pulled a gun on Rogelio and shot him multiple times. But there were several witnesses not associated with either family who heard what happened.

---

[2]     Defendant does not challenge the sufficiency of the evidence to support the jury's verdict, and we state the facts in the light most favorable to the People. (*People v. Perez* (2010) 50 Cal.4th 222, 229; *People v. Cooper* (1979) 94 Cal.App.3d 672, 676, fn. 2.)

4

Oscar Ibarra (Ibarra) lived in the house between the Pineda and Islas homes, and he heard a woman say in a scared voice, "No, Junior.  Don't do it," followed by multiple gunshots two or three seconds later.  (Because defendant and his father shared the same name, defendant was often called "Junior."  Defendant's mother also referred to defendant as "Papa.")  Maria Soto, an off-duty police officer who was visiting the home next to the Islas family's house, heard a woman scream "no, poppy, no" in Spanish and then the sound of shots fired.

Another neighbor who lived two houses down from the Islas family home, Gustavo Silva (Silva), heard the gunshots and looked out his window.  Seconds later, Silva heard Connie frantically say, "No, Junior.  No.  You don't do that.  Why did you do that?"  Silva then saw someone (he could not see who) pushed into a waiting SUV, which then "burned rubber" driving away from the scene.  In the meantime, the other neighbor, Ibarra, had seen defendant run toward the SUV.  Although Ibarra could not see defendant enter the vehicle, defendant was no longer in the area after the SUV drove off at high speed.

When the SUV raced away, defendant, Senior, and Bautista (and defendant's infant daughter) were inside; Connie was left behind.  Silva saw Connie get on her cell phone and heard her say:  "Mom, he killed him.  He killed him.  What do I do?"; and then, "Junior.  Junior.  Junior.  Junior killed him.  What do I do?"[3]  This, however, was not Connie's own account of

---

[3]     Ibarra also saw Connie talking on her cell phone, but he could not hear what she was saying.  Ibarra later asked Connie what happened and she said, while crying, "He shot" and "He had a gun."

the phone call.  She said she called her mother a minute or two after the shooting and said, "Mom, my dad just shot the neighbor."  Connie's mother remembered the phone call in the same way, i.e., with Connie identifying her father, not defendant, as the killer.

Connie also sent text messages after the shooting, including a 3:02 p.m. message to her then-boyfriend.  (The content of that text message was not offered into evidence at trial—a topic we will return to momentarily.)  Connie's boyfriend called her back after receiving the text message and she told him "her dad just shot the neighbor."[4]

Law enforcement investigation following the shooting determined Rogelio had been shot five times, including two shots that were fatal (one to the back of the head and another to the lower back).  Initially, Connie, Bautista, and defendant's mother did not tell the police that Senior was the culprit in Rogelio's murder.  They advised the police that Senior was the shooter only later, during interviews approximately seven months after the killing.

---

[4]     According to defendant's mother, Senior picked her up in the SUV after fleeing the scene of the crime (by then, no one else was in the vehicle) and he admitted shooting Rogelio.  When asked later during trial, the Pineda family witnesses testified they had not seen or heard from Senior after the day of the shooting.

B.	*The District Attorney Charges Defendant With Murder, and the Trial Court Denies a Defense Motion to Continue the Trial*

At the time of Rogelio's murder, California law allowed prosecutors to file murder charges against a defendant over 16 years old directly in a court of criminal jurisdiction, meaning a court assigned responsibility for adjudicating charges against adult offenders rather than a juvenile court.  (Former Welf. & Inst. Code, § 707, subds. (b)(1), (d)(1), added by Stats. 1975, ch. 1266, § 4, as amended by Prop. 21, § 26, approved March 7, 2000.)  Using this "direct file" procedure, the Los Angeles County District Attorney in October 2014 charged defendant with Rogelio's murder in a court of criminal jurisdiction.

During the proceedings that ensued, defendant was initially represented by retained counsel.  At a court appearance in December 2014, the trial court relieved retained counsel at defendant's request and appointed the public defender to represent defendant.  The court advised defendant that his new attorney would need time to get up to speed on the case, and defendant agreed to continue the trial date to allow counsel to do so.

At a pretrial conference in March 2015, the trial court set May 5, 2015, as the trial date.  The court also scheduled a discovery compliance hearing on April 2, 2015, and a pretrial conference on April 17, 2015.  At the pretrial conference on April 17, 2015, the trial court denied an oral motion by the defense to continue the trial.

Twelve days later, and less than a week before trial, the defense filed a written motion seeking a 14-day continuance of the trial date.  The declaration from defense counsel asserted a

continuance was warranted for a variety of reasons.  Specifically, defense counsel contended (1) he expected to be in trial on another case on the existing trial date, (2) his investigator was attempting to subpoena a "newly found witness" (Connie's former boyfriend who received her text message following the shooting), (3) the defense ballistics and crime reconstruction expert had not yet completed her final report, (4) the defense was attempting to recover the content of the text message Connie sent her boyfriend after Rogelio's shooting, (5) he received "hours more of recorded phone calls . . . from the prosecution, and . . . [was] still listening to CDs (with recorded witness statements) received from the prosecution during the past month," and (6) he had inherited a felony caseload including multiple "'life cases,'" which affected his ability to prepare for trial even though he had "committed a great deal of time in attempting to become ready to handle this matter expeditiously."

Regarding the asserted need for more time to try to recover the text message, defense counsel's declaration stated "the defense investigators [ ]who have done extensive work on this case [ ]since the Public Defender's Office was appointed approximately four months ago" had sent Connie and her boyfriend's damaged cell phones to the Computer Crime Institute at Dixie State University (the Dixie State Institute).  The declaration explained the phones had been previously sent to another laboratory that had no success in recovering "crucial text messages" and the Dixie State Institute was one of the only labs that could attempt "chip extractions" that might recover the message.  Defense counsel declared he left a message with the Dixie State Institute the day before filing the continuance motion

8

to determine when their work would be completed but had not "heard back yet."

The prosecution opposed the defense request to continue the trial date. The prosecution's opposition brief responded to each of the reasons defense counsel raised as grounds for a continuance, including the effort to recover the content of the text message Connie sent after the shooting. The prosecutor explained she had spoken with a Dixie State Institute representative on the same day the defense attorney contacted the institute. The representative told the prosecutor there were no guarantees the chip extraction would be successful but the institute should have an answer by May 1, 2015. As to the asserted defense need for more time to review recordings of jail calls and visits, the prosecution's opposition stated: "As the court is aware[,] on April 2, 2015, the People turned over CDs consisting of jail calls and jail visits. The Court informed the Defendant that the People were monitoring his calls and visits. If the Defendant continues to make calls and receive visits and those are monitored, the prosecution has a continuing obligation to turn over such evidence. As such, this is an ongoing issue that does not serve as a basis for a continuance."

On the morning of trial, the court heard argument on the defense's motion for a 14-day continuance. Defense counsel acknowledged several of the issues he asserted as grounds for a continuance had been resolved and he was "very close to be[ing] ready." But counsel maintained the requested continuance remained necessary because the Dixie State Institute was still working on recovering the text message from Connie to her boyfriend and because "there are hours worth of CD's and calls that I have been trying to get through and there is more to be

done on that." As to the text message issue in particular, defense counsel asserted he had learned that morning that Dixie State Institute personnel were not able to extract information from the chip on one of the damaged phones but they were working on the second phone and he expected they would be done with their work 14 days later, on May 19, 2015.

The prosecution persisted in its opposition to the requested continuance, explaining it was not clear why Dixie State Institute personnel needed until May 19 when they previously said they would have an answer by May 1. The prosecution also noted that if a continuance were granted to review the jail calls, the case would never go to trial because defendant continued to make calls and receive visitors, which generated additional recordings that had to be produced.

Having heard from both sides and considered the defense declaration and the prosecution's written opposition, the trial court denied the motion for a continuance and sent the case out for trial.

C.    *Jury Instructions and the Verdict*

Trial proceeded over the course of six days. Defendant put on a substantial defense case, testifying himself and calling his mother, Bautista, Connie, and Connie's former boyfriend (among others) as witnesses.

The defense at trial was not simply that the prosecution had the wrong guy, i.e., that Senior, not defendant, shot Rogelio. Rather, defendant also relied on the testimony at trial to contend he was not guilty of murder even if the jury believed he was the shooter because he shot Rogelio in an objectively reasonable response to long-term provocation (the family feuding), which

10

would make the crime voluntary manslaughter rather than murder.

In aid of this alternative defense, defendant proposed the court give an instruction he formulated concerning "long-term provocation." The instruction stated: "Provocation may be established even though there was not a single incident qualifying as sufficient provocation. Provocation may be established by a long period of minor events culminating in sufficient provocation." The trial court declined to give this proposed pinpoint instruction, reasoning the provocation concept was adequately covered in the instructions the court intended to give.[5]

For its part, the prosecution asked the trial court to instruct the jury that defendant's flight from the scene of the crime was a fact it could use to infer consciousness of guilt. The court agreed, stating it would give CALCRIM No. 372.[6] Defense

---

[5]     The court instructed the jury with CALCRIM Nos. 522 and 570. CALCRIM No. 522 advised the jury that provocation may reduce a murder from first degree to second degree, or to manslaughter, and that the "weight and significance of the provocation, if any, are for you to decide." CALCRIM No. 570 informed the jury that it could find defendant guilty of voluntary manslaughter if he killed in response to provocation that would cause an average person to act rashly from passion rather than judgment. As relevant here, the instruction stated "[s]ufficient provocation may occur over a short or long period of time."

[6]     As given, CALCRIM No. 372 stated: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and

11

counsel made no request to modify the flight instruction, nor did he propose the trial court instruct the jury that it could consider Senior's flight from the scene of the crime in the same manner.[7] During closing argument, however, defense counsel argued without objection that Senior's flight from the scene of the murder was evidence of his guilt: "[W]hat father would allow his son to be taken into custody, or at least, not come back? And what—in a situation where [Senior's] just gone, unless he was the killer. It's just common sense."

During its summation, the prosecution urged the jury to convict defendant of first degree murder, i.e., murder that is willful, deliberate, and premeditated. The jury, however, found defendant guilty of second degree murder. The jury also found true personal use of a firearm enhancements that had been alleged in connection with the murder charge. At sentencing, the trial court considered on the record the factors for sentencing a juvenile described in *Miller v. Alabama* (2012) 567 U.S. 460 and its progeny. The court sentenced defendant to an aggregate term of 40 years to life, consisting of 15 years to life for the second degree murder conviction, and a consecutive 25 years to life pursuant to Penal Code section 12022.53, subdivision (d) based on defendant's personal use of a firearm causing Rogelio's death.

importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

[7] Defendant's attorney objected to the CALCRIM No. 372 instruction, but only on the ground that defendant turned himself in to the police four days after Rogelio's murder. In defendant's view, this meant he had not fled.

12

Defendant noticed a timely appeal from the judgment of conviction on October 28, 2015.  Just over a year later voters approved the Public Safety and Rehabilitation Act of 2016, denominated Proposition 57 (hereinafter, "the Act"), at the November 2016 general election.  The Act took effect the next day, November 9, 2016.

## II.  DISCUSSION

Section 4 of the Act (hereinafter, "Section 4") amended Welfare and Institutions Code section 707 to eliminate former subdivision (d), which gave prosecutors discretion to directly file charges against certain juvenile defendants in a court of criminal jurisdiction.  This direct file authority avoided the need to file a petition in juvenile court and then seek judicial approval to transfer the case to a court of criminal jurisdiction.  (See generally *People v. Vela* (2017) 11 Cal.App.5th 68, 73-75, review granted July 12, 2017, S242298 (*Vela*).)  Had defendant been charged after enactment of Section 4, there is no question he would have been entitled to a fitness hearing in juvenile court, at which a judicial officer would determine whether to transfer his case to a court of criminal jurisdiction in light of five specified statutory criteria, and after reviewing a report prepared by a probation officer.  (Welf. & Inst. Code, § 707, subd. (a) [listing criteria, including the minor's previous delinquent history, whether the minor can be rehabilitated before expiration of juvenile court jurisdiction, and the circumstances and gravity of the offense].)  Of course, defendant was charged well before California voters enacted Section 4, so the question for us is whether he is entitled to the benefit of the changes worked by the Act.

13

Recognizing our Supreme Court will soon have the final word, we hold Section 4 applies to every minor to whom it can constitutionally apply, which includes defendant because his conviction is not yet final. We further hold defendant's remaining arguments for reversal—the denial of his motion to continue the trial and the asserted instructional errors—are meritless. In light of these twin holdings, we conclude the same remedy ordered in *Vela* is appropriate here: conditional reversal of the judgment with directions to afford defendant the hearing required by Welfare and Institutions Code section 707 (as amended by the Act), if requested by the prosecution.

A.     *Section 4's Statutory Changes Apply to Defendant and Require a Conditional Reversal of the Judgment*

Six published Court of Appeal opinions have endeavored to discern the voters' intent in enacting Section 4, although only five have found it necessary to decide the precise question we confront here: whether Section 4's amendments to the Welfare and Institutions Code apply to juveniles charged or convicted before the section's effective date. (*People v. Superior Court* (*Walker*) (2017) 12 Cal.App.5th 687 (*Walker*); *People v. Marquez* (2017) 11 Cal.App.5th 816 (*Marquez*), review granted July 26, 2017, S242660; *Vela, supra,* 11 Cal.App.5th 68, rev. gr.; *People v. Mendoza* (2017) 10 Cal.App.5th 327, review granted July 12, 2017, S241647 (*Mendoza*); *People v. Cervantes* (2017) 9 Cal.App.5th 569, review granted May 17, 2017, S241323 (*Cervantes*); see also *People v. Superior Court* (*Lara*) (2017) 9 Cal.App.5th 753, 774, review granted May 17, 2017, S241231 [finding it unnecessary to consider whether the changes worked by Section 4 amount to a legislative reduction in the punishment

14

for a crime].)  Having granted review (so far) of all but one of these cases, our Supreme Court will ultimately resolve the question we must decide.  Our discussion of the ramifications of Section 4 for this case will therefore get right to the point.

The weight of published authority concludes Section 4's elimination of direct filing authority does not require reversal for a juvenile convicted before Section 4 took effect—regardless of whether the conviction in question is final.  (*Marquez, supra*, 11 Cal.App.5th at pp. 820-821, rev. gr.; *Mendoza, supra*, 10 Cal.App.5th at pp. 345, 348, rev. gr.; *Cervantes, supra*, 9 Cal.App.5th at pp. 580, 601-602, rev. gr.; see *Walker, supra*, 12 Cal.App.5th at pp. 697-699; see also *People v. Vieira* (2005) 35 Cal.4th 264, 306 ["[F]or the purpose of determining retroactive application of an amendment to a criminal statute, a judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed"].)  But we exercise judgment not by counting the number of published opinions on either side of an issue but rather by assessing the persuasiveness of the reasons offered for reaching one outcome or another.  Without doubt, the question of Section 4's application to convictions that preceded its effective date has spawned reasonable disagreement, but we find the analysis in *Vela* to be generally the better reasoned approach.

We acknowledge at the outset that the general rule is that legislative changes ordinarily apply only prospectively, "'absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise.' (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 287 [ ] (*Tapia*) . . .)" (*Cervantes, supra*, 9 Cal.App.5th at p. 599, rev. gr.)  It is also true that the text of the Act itself is silent on whether Section 4 should

15

apply to convictions sustained, or charging decisions made, prior to its enactment.[8] (See, e.g., *Marquez, supra,* 11 Cal.App.5th at p. 822, rev. gr.) But the ultimate question we answer in this case (as in every case concerning the proper effect to be given to an initiative) is what did the voters who approved the Act intend. The answer to that question turns, in our view, on a proper application of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*); an appreciation of the Act's purposes, which the Act itself lays bare in its uncodified provisions; and an understanding of the differences between juvenile and criminal adjudication. On each of these points, we believe *Vela* arrives at the correct conclusion.

---

[8] Because the Act includes no express provision declaring whether it applies prospectively or retrospectively, the question of the voters' intent must be resolved by reference to background legal principles. Put more concretely, voters were not told Section 4 would apply retrospectively, but neither were they told it would apply only prospectively; the choice between the two modes of application necessarily turns on the correct application of settled, judicially developed interpretive principles. (See, e.g., *People v. Burton* (1989) 48 Cal.3d 843, 861; *People v. Weidert* (1985) 39 Cal.3d 836, 844 ["The enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted"]; see also *People v. Valencia* (2017) 3 Cal.5th 347, 379 (conc. opn. of Kruger, J.) ["California cases have established a set of standard rules for the construction of voter initiatives. 'We interpret voter initiatives using the same principles that govern construction of legislative enactments.' [Citation.]"].) In this vein, we further note there is no support for the proposition that the intentions or expectations of voters who passed an earlier, unrelated initiative measure should control the interpretation of an initiative measure enacted by a differently composed electorate years later.

16

*Estrada* stands as an exception to the general rule that legislative changes ordinarily operate prospectively. (*Cervantes, supra*, 9 Cal.App.5th at p. 599, rev. gr.) As recounted in *Vela, Estrada* holds that "'[w]hen the Legislature amends a statute so as to lessen the punishment[,] it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply.'" (*Vela, supra*, 11 Cal.App.5th at p. 77, rev. gr., quoting *Estrada, supra*, 63 Cal.2d at pp. 744-745.)

We agree with *Vela*'s conclusion that the changes in law worked by Section 4 are, for *Estrada* purposes, amendments that lessen the punishment for crimes committed by juvenile defendants. (*Vela, supra*, 11 Cal.App.5th at pp. 77-78, rev. gr.) Thus, under the interpretive rule announced in *Estrada*, we presume the voters who approved the Act intended defendant to benefit from the repeal of the direct filing procedure and the corresponding requirement for a juvenile court fitness hearing because he is among the people to whom those changes may still constitutionally apply. (*Id.* at p. 78 ["[W]e find an 'inevitable inference' that the electorate 'must have intended' that the potential 'ameliorating benefits' of rehabilitation (rather than punishment), which now extend to every eligible minor, must now also 'apply to every case to which it constitutionally could apply'"].)

The conclusion that Section 4 is properly seen as a measure reducing the punishment for crimes makes sense in light of the

markedly reduced emphasis on punishment in juvenile courts, as compared to courts of criminal jurisdiction. *Vela* details the differences between the two court systems at length. (*Vela*, *supra*, 11 Cal.App.5th at pp. 73-74, rev. gr. [quoting the observation in *In re Julian R.* (2009) 47 Cal.4th 487, 496 that the "'[s]ignificant differences between the juvenile and adult offender laws underscore their different goals: The former seeks to rehabilitate, while the latter seeks to punish'"]; see also Welf. & Inst. Code, § 607 [juvenile court jurisdiction over a juvenile offender extends, at most, to the time at which the offender turns 25 years of age]; Cal. Code Regs., tit. 15, §§ 4951-4957 [parole consideration dates for juvenile offenders range from a year or less up to a maximum of seven years, depending on the severity of the offense].)

In addition, the upshot of the *Estrada* rule—that courts will presume a measure reducing the punishment for an offense applies to all cases in which the punishment may be constitutionally reduced—is consistent with the voters' declared purposes in approving the Act. Those purposes include "[s]top[ping] the revolving door of crime by emphasizing rehabilitation, especially for juveniles"; "[r]equir[ing] a judge, not a prosecutor, to decide whether juveniles should be tried in adult court"; and "[s]av[ing] money by reducing wasteful spending on prisons." (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57, p. 141 [§ 2].) Section 5 of the Act directs that it should be construed broadly to accomplish these purposes, and we agree with *Vela* that the statements of purpose in the Act further demonstrate that "the intent of the electorate in approving [the Act] was to broaden the number of minors who could potentially stay within the juvenile justice system, with its primary

18

emphasis on rehabilitation rather than punishment."  (*Vela*, *supra*, 11 Cal.App.5th at p. 76, rev. gr.)

The *Vela* opinion also rebuts—persuasively so, in our view—the central rationale on which the *Cervantes* line of cases relies to hold Section 4 does not affect a defendant charged and convicted before the Act took effect.  Those cases read our Supreme Court's decision in *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*) as having limited the *Estrada* interpretive rule to applying only where a legislative change reduces the punishment for a *particular criminal offense*.  (See, e.g., *Mendoza*, *supra*, 10 Cal.App.5th at p. 348, rev. gr.; *Cervantes*, *supra*, 9 Cal.App.5th at p. 600, rev. gr. ["[L]ater Supreme Court cases have limited *Estrada's* retroactivity exception to statutory changes that mitigate the penalty for a particular crime . . ."].)  They then reason Section 4 does not reduce the penalty for a particular crime, even though juvenile courts cannot order offenders to be held in custody as long as courts of criminal jurisdiction can, because Section 4's amendments provide only an uncertain benefit, namely, a fitness hearing that might or might not result in the transfer of a juvenile offender to a court of criminal jurisdiction.  (See, e.g., *Marquez*, *supra*, 11 Cal.App.5th at pp. 826-827, rev. gr.; *Mendoza*, at p. 348 ["We acknowledge that the amendments [made by Section 4] may have the effect of reducing the punishment in some cases because, unlike adult court sentences, the longest that juvenile court jurisdiction generally extends is until the juvenile offender is 25 years old.  [Citation.] But, as the *Brown* court reasoned . . . , the *Estrada* rule is not applicable to any amendment that *may* reduce a punishment"]; *Cervantes*, at pp. 601-602.)

19

*Vela*, however, cites authority—including *People v. Francis* (1969) 71 Cal.2d 66 (*Francis*) and *Estrada* itself—that holds a contingent reduction in penalty (meaning a reduction that may or may not actually take place, depending on the exercise of discretion) still warrants invocation of the presumption that the change in law was intended to apply as broadly as constitutional principles permit. (*Vela*, *supra*, 11 Cal.App.5th at pp. 78-80, rev. gr.) *Francis*, in particular, is key. In that case, the Legislature changed the statutorily authorized penalty for Francis's marijuana possession crime while his case was on appeal, making the crime a "wobbler" rather than a straight felony. (*Francis*, at p. 75.) Our Supreme Court acknowledged Francis's case was somewhat unlike *Estrada* because the change did not "revoke one penalty and provide for a lesser one but rather vest[ed] in the trial court discretion to impose either the same penalty as under the former law or a lesser penalty." (*Id.* at p. 76.) But our Supreme Court held the "'inevitable inference'" drawn in *Estrada*, i.e., that the Legislature intended the amendment to apply to every case to which it could constitutionally apply, applied equally in Francis's case because the legislative change was a determination "that the former penalty provisions may have been too severe *in some cases* and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Ibid.* (emphasis added); see also *Vela*, at pp. 79-80.)

The same analysis obtains with respect to Section 4: the voters who approved the Act determined criminal punishment for juvenile offenders may be too severe in some cases, namely, those where a judge declines to order the transfer of an offender to a court of criminal jurisdiction—an adjudicatory forum in which

there is a greater focus on punishment instead of rehabilitation and greater latitude to impose substantially longer custodial sentences.  In other words, the holding in *Francis*, especially when combined with what *Vela* describes as the "sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders" (*Vela*, *supra*, 11 Cal.App.5th at p. 75, rev. gr.), convinces us California voters intended Section 4's amendments to then-existing law to apply to all juveniles possible, including defendant, because punishing those juveniles with criminal court sentences might in some cases be too severe.[9]

Having held defendant is entitled to the benefit of Section 4's amendments to section 707 of the Welfare and Institutions Code, reversal of the judgment is required because defendant has

---

[9]     To the extent the *Cervantes* line of cases can be read to suggest the *Estrada*/*Francis* rule applies only where the legislative change enumerates a specific penal statute (as with Health and Safety Code section 11530 that was at issue in *Francis*), we think the suggestion unjustifiably elevates form over substance.  If California voters approved an amendment to Penal Code section 190 that stated any person guilty of murder in the first or second degree, who was 17 years old at the time of the crime, could be sentenced to a maximum of eight years in prison, we (and presumably other courts) would have no difficulty concluding the amendment would apply to all convictions not yet final.  Nor would we have any difficulty reaching the same conclusion if California voters made similar amendments to multiple penal statutes all in the same initiative measure. Section 4, in substance, is no different—it provides for analogous, albeit contingent, reductions in punishment for a host of penal statutes without need of going to the trouble of enumerating them all.

not had the fitness hearing that section requires, if requested. The question remains, however, what form the reversal should take.  We agree with *Vela* that a conditional reversal of the judgment is the remedy that best gives effect to the voters' intentions in passing the Act.[10]  (*Vela*, *supra*, 11 Cal.App.5th at pp. 81-82, rev. gr.)  But a *conditional* reversal is only appropriate in this case if the reversal is necessary solely to give effect to our holding with respect to the ramifications of the Act's passage.  We therefore proceed to discuss defendant's other assertions of error and conclude a conditional reversal is indeed the appropriate remedy because all of defendant's remaining arguments for outright reversal lack merit.

**[Parts II.B through II.D, below, are deleted from publication.  See *post* at page 33 for where publication is to resume.]**

---

[10]     Because we reverse the judgment, albeit conditionally, there is no concern that it is impossible to comply with the terms of Section 4.  For one thing, the prosecution theoretically could opt not to file a motion for a fitness hearing, in which case there would obviously be no concern that such a motion was not "made prior to the attachment of jeopardy."  (Welf. & Inst. Code, § 707, subd. (a)(1).)  But even understanding a fitness hearing motion is likely a foregone conclusion here, there is still no reason to believe complying with the terms of Section 4 is impossible.  Reversal of the judgment effectively operates to vitiate the prior attachment of jeopardy—as even *Cervantes* appears to recognize.  (*People v. Eroshevich* (2014) 60 Cal.4th 583, 590-591; *Cervantes*, *supra*, 9 Cal.App.5th at p. 608, rev. gr. ["Under a waiver theory, jeopardy apparently does *reattach* with the swearing of a second jury on remand . . ."], emphasis added.)

22

## B. The Court Did Not Abuse Its Discretion in Declining to Continue the Trial for 14 Days

"A continuance in a criminal case may be granted only for good cause. (§ 1050, subd. (e).)  Whether good cause exists is a question for the trial court's discretion.  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [ ].)  The court must consider ""not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.""" (*Ibid*.)  While a showing of good cause requires that both counsel and the defendant demonstrate they have prepared for trial with due diligence (*ibid*.), the trial court may not exercise its discretion 'so as to deprive the defendant or his attorney of a reasonable opportunity to prepare.' (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [ ].)

"A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process.  (*People v. Frye, supra*, 18 Cal.4th at p. 1013 [ ].)  Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1126 [ ].)"  (*People v. Doolin* (2009) 45 Cal.4th 390, 450 (*Doolin*); see also *People v. Beeler* (1995) 9 Cal.4th 953, 1003 ["An important factor for a trial court to consider is whether a continuance would be useful. . . . [T]o demonstrate the usefulness of a continuance[,] a party must show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time"], overruled on other grounds as recognized in

*People v. Edwards* (2013) 57 Cal.4th 658, 705; *People v. Fuiava* (2012) 53 Cal.4th 622, 650 [an order denying a continuance is seldom successfully attacked, and the party challenging the order bears the burden of establishing an abuse of discretion].)

Of the six reasons defendant originally proffered in seeking a continuance in the trial court, he advances only two on appeal to contend the trial court abused its discretion in denying his requested 14-day continuance: (a) he needed more time to allow the Dixie State Institute to attempt to recover the text message Connie sent her boyfriend after the shooting, and (b) he needed more time to review the recordings of his own jail phone calls and visits. We hold the trial court did not err in denying the requested continuance for either reason.

Take, first, the claim that additional time was needed to try to recover the text message Connie sent her boyfriend after Rogelio's murder. While the question of whether the text message would have been cumulative or even probative is debatable, we have no doubt that the trial court was well within its discretion to conclude a continuance of the trial was unlikely to be useful to the defense. The evidence before the trial court at the time of defendant's continuance motion indicated initial laboratory efforts to recover the text message had not succeeded, there were no guarantees that then-ongoing efforts would be successful, and there appeared to be a conflict in the Dixie State Institute's estimates as to when its work would be completed. Under the circumstances, and even if it believed the recovery of the text message would be to defendant's benefit, the trial court could reasonably conclude defendant had not shown a "likelihood that such benefit will result" (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 1037) if the continuance were granted. Moreover, and for

24

much the same reason, the record establishes it is impossible for defendant to show he was prejudiced by the denial of the continuance to try and recover the text message. A 14-day continuance would not have assisted the defense because, at the time defendant filed his motion for new trial four months *after* the jury convicted him, Dixie State Institute had still been unable to recover the text message and had returned the damaged phones to the defense.[11]

Turning, second, to the asserted need for a continuance because defense counsel needed more time to review the recordings of his client talking with family members (and others) while in custody, we likewise see no abuse of discretion in rejecting this proffered reason to continue the trial. Defense counsel vaguely described there being "hours['] worth" of recordings, but he presented no specifics as to the precise volume of materials, the amount of time required to review them, nor a detailed explanation for why he or his investigator had not been able to review the recordings in the month (or for those

---

[11] The defense motion for new trial argued, among other things, that there was "newly discovered evidence." In connection with its motion, the defense submitted a supplemental report from one of its investigators that provided further details concerning the Dixie State Institute's efforts to recover the text message between Connie and her boyfriend. According to the report, the cell phones used by Connie and her boyfriend were sent to the institute in April 2015 but returned to the defense in early June 2015 because efforts to extract the text message were unsuccessful: Connie's phone was too damaged to extract information and the damage to her then-boyfriend's phone prevented the recovery of any data without a passcode—which neither Connie nor her boyfriend could provide.

25

recordings produced at or after the April 17, 2015, pre-trial conference, the two weeks) before trial. (*Doolin*, *supra*, 45 Cal.4th at p. 451 [request for continuance to interview witnesses properly denied where "only a general assertion" of the need for more time made in continuance motion and no explanation provided as to why the witnesses could not be interviewed in the six days before the penalty phase of the death penalty case]; see also *People v. Snow* (2003) 30 Cal.4th 43, 75 [denial of continuance not an abuse of discretion where counsel made "bare assertion" that additional time was needed to complete examination of paint samples].) Perhaps even more important, the prosecution's opposition to the continuance motion identified the fundamental problem with the defense request for additional time to listen to the jail recordings: defendant had been advised his calls and visits in custody were recorded, the prosecution believed it was obligated to produce the recordings as statements made by defendant (Pen. Code, § 1054.1, subd. (b)),[12] and yet defendant continued to make calls and see visitors. That meant a 14-day continuance was unlikely to be helpful because defendant would engage in additional jail communications, which would generate more recordings, which the prosecution would produce, and which the defense would then need more time to review.

---

[12]    The recordings—more precisely, just three of the recordings—were used by the prosecution during trial only to impeach the testimony of witnesses called during the defense case. Before permitting the prosecution to play the recordings for the jury, the trial court allowed defense counsel to hear the recordings outside the presence of the jury and raise objections.

26

*C.    The Trial Court Had No Sua Sponte Duty to Give a Third Party Flight Instruction, and There Is No Basis to Conclude Defendant's Attorney Was Ineffective for Not Requesting Such an Instruction*

Defendant argues the trial court should have instructed the jury it could infer Senior's flight from the scene of Rogelio's murder was evidence of his consciousness of guilt in the same manner that the court instructed the jury it could draw this inference with respect to defendant's flight. He concedes his trial attorney made no request for such a "third party flight" instruction, but he argues the trial court had a sua sponte duty to give such an instruction (or to make appropriate modifications to the flight instruction it did give respecting defendant). Defendant further contends that in the event we conclude the trial court had no such duty, his attorney's failure to request a third party flight instruction constitutes ineffective assistance of counsel requiring reversal. We believe defendant is wrong on both counts, for reasons we now explain.

Penal Code section 1127c provides that "[i]n any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as" described in the CALCRIM No. 372 instruction the trial court gave in this case. As the statutory language we have quoted demonstrates, Penal Code section 1127c is solely focused on the flight of a defendant, and there is no similar statutory provision requiring a trial court to sua sponte instruct the jury on third party flight as consciousness of guilt. Controlling and persuasive authority holds there is no such sua sponte obligation. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1224 (*Rangel*); *People v. Henderson* (2003) 110 Cal.App.4th 737, 742

27

[although a defendant can be entitled to a pinpoint instruction on third party flight if properly prepared and submitted by the defense, "there is no authority which would compel a trial judge to draft such an instruction or to give it on the court's own motion"].)

Defendant's opening brief can be read to argue, however, that the trial court had a duty to give such a third party flight instruction in this case because defendant was relying on the defense that Senior was really the shooter, and Senior fled the scene just as defendant did. The argument appears to invoke case law holding trial courts have a sua sponte obligation to instruct the jury on applicable defenses on which a defendant relies. (See, e.g., *People v. Perez* (1992) 2 Cal.4th 1117, 1129 [a court must instruct on general principles of law closely and openly connected with the facts of the case, which encompasses the duty to instruct on defenses raised by the evidence].)

The same argument, based on essentially the same scenario (an instruction on flight as consciousness of guilt given, but no reference made in the instruction to other fleeing parties), was made and rejected in *Rangel*. The *Rangel* court held, in terms equally applicable here: "The trial court must instruct sua sponte as to defenses ""that the defendant is relying on . . . or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."" [Citation.] Third party flight, however, is not a defense. Rather such flight "'is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt.'" [Citation.] As such, the burden falls on the defendant to request the instruction." (*Rangel*, *supra*, 62 Cal.4th at p. 1224.) The absence of any request for a third party flight

28

instruction here therefore forfeited the instructional error claim. (*Id.* at p. 1223.)

We further hold defendant has not shown his trial attorney provided constitutionally deficient representation by not asking the trial court to instruct the jury on third party flight as consciousness of guilt. "'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].)" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 (*Carter*).) "[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.] Accordingly, [our Supreme Court has] characterized defendant's burden as 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on ineffective assistance of counsel on direct appeal only if there is affirmative evidence that counsel had ""no rational tactical purpose"" for an action or omission. [Citation.]" (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," a reviewing court on direct appeal must reject a claim of ineffective assistance of counsel "unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*Carter*, at p. 1189.)

Here, defense counsel might have decided that a third party flight instruction would be of little benefit because "'[t]he

29

logic of the inference' that . . . flight could also indicate consciousness of guilt on the part of third parties would have been 'plain' to jurors, even in the absence of [an] instruction to that effect. [Citation.]" (*People v. Rangel*, *supra*, 62 Cal.4th at p. 1224.) Or, defense counsel might have believed he was better off arguing, without an instruction, that Senior's flight proved he was the shooter—which he did, see *ante*—because a flight instruction is not entirely favorable to the party who hopes the jury will draw a consciousness of guilt inference. As phrased, CALCRIM No. 372 permits such an inference but does not compel it, and the instruction expressly prohibits a conclusion of guilt based on flight alone.[13] Because there appear to be several possible grounds on which defendant's trial attorney might have decided not to ask for an instruction regarding Senior's flight, we must reject defendant's claim of ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

Moreover, we believe defendant has made an insufficient showing of prejudice to satisfy the *Strickland v. Washington* standard. This was a classic credibility contest between witnesses for the prosecution and the defense (with the defense also benefitting from the testimony of Maria Soto, the off-duty police officer called by the People). Especially in light of the relatively minimal attention a consciousness of guilt inference

---

[13] In addition, and as defendant's opening brief recognizes, defendant pursued "a two-pronged defense" at trial, arguing that Senior was the shooter and, alternatively, that defendant was provoked even if it were true that he (defendant) was the killer. Balancing these two defenses is a delicate task, and defense counsel might have had tactical reasons for opting to forego a third party flight instruction.

received during the closing arguments by both sides, we do not believe such an inference was at all likely to have been a difference-maker in the jury's deliberations.

> D. *The Trial Court Did Not Err in Declining to Give Defendant's Proposed Pinpoint Instruction on Long-Term Provocation*

Defendant contends the trial court erred in refusing to give his requested pinpoint instruction on "long-term" provocation. The instruction requested and formulated by the defense provided: "Provocation may be established even though there was not a single incident qualifying as sufficient provocation. Provocation may be established by a long period of minor events culminating in sufficient provocation." We hold the legal concept this instruction sought to convey was duplicative of the CALCRIM No. 570 instruction the court gave, and thus, the trial court did not err in declining to give the defense-proposed instruction.

"A defendant is entitled, upon request, to a nonargumentative instruction that pinpoints his or her theory of the case. . . . 'In a proper instruction, "[w]hat is pinpointed is not specific evidence as such, but the theory of the defendant's case."'" [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 720.) "[A] trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.)

The instruction defendant requested regarding long-term provocation duplicated, in all material respects, the CALCRIM

No. 570 instruction given by the court. CALCRIM No. 570 informed the jury that "[s]ufficient provocation may occur over a short or long period of time," and though it does not use the term "minor events" or make reference to "a single [qualifying] incident" as in the defense-proposed instruction, it fully conveys the same core concept, i.e., that the jury could consider the prior family feuding the defense witnesses described when determining whether defendant was sufficiently provoked such that he was guilty of manslaughter, not murder. Because defendant's proposed long-term provocation instruction was merely duplicative, the trial court did not err in rejecting it. (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 484 ["To the extent defendant's proposed instruction correctly stated the law, the trial court properly rejected it as duplicative of the standard instruction that the court gave . . ."]; compare *People v. Wharton* (1991) 53 Cal.3d 522, 571 (*Wharton*) [court erred in rejecting the defense proposed pinpoint instruction on provocation; it was not duplicative because the instructions given did not inform the jury that provocation could "occur over a considerable period of time"].)

Furthermore, even assuming the court erred by declining to give the defense instruction, no prejudice to defendant resulted. In closing argument, defendant's trial attorney briefly touched on the long-term provocation concept by arguing the instructions on manslaughter and heat of passion applied to defendant in light of the evidence presented at trial. With the CALCRIM No. 570 instruction given and this reference by defense counsel, any possible error from failure to give the defense-formulated provocation instruction was harmless under the applicable *People v. Watson* (1956) 46 Cal.2d 818 standard for assessing prejudice. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144-1145 [no

32

prejudicial error because "nothing in [the standard instructions given] *precluded* the jury from finding adequate provocation resulting from conduct occurring over a considerable period of time"]; *Wharton*, *supra*, 53 Cal.3d at pp. 571-572 [absence of instruction on long-term provocation, though error, was harmless in light of other instructions given and defense counsel's argument to the jury].)

**[The remainder of the opinion, including the concurring and dissenting opinion of Kriegler, J., is to be published.]**

DISPOSITION

The judgment is conditionally reversed. The cause is remanded to the juvenile court with directions to conduct a fitness hearing under Welfare and Institutions Code section 707, if the prosecution moves for such a hearing, no later than 90 days from the date the remittitur issues. If, after a fitness hearing, the juvenile court determines that it would have transferred defendant to a court of criminal jurisdiction, the judgment of conviction shall be reinstated as of the date of that determination. If no motion for a fitness hearing is filed, or if a fitness hearing is held and the juvenile court determines that it would not have transferred defendant to a court of criminal jurisdiction, defendant's criminal conviction, including the true findings on the alleged enhancements, will be deemed to be juvenile adjudications as of the date of the juvenile court's determination. In the event the conviction is deemed a juvenile adjudication, the juvenile court shall then conduct a dispositional

hearing and impose an appropriate disposition within the court's discretion.

**CERTIFIED FOR PARTIAL PUBLICATION**

BAKER, J.

I concur:

DUNNING, J.[*]

---

[*] Judge of the Orange Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

KRIEGLER, Acting P.J., concurring in part and dissenting in part

People v. Pineda
B267885


I concur in the majority opinion to the extent it affirms defendant's conviction of second degree murder with personal use of a firearm. I respectfully dissent from that portion of the opinion conditionally reversing the judgment with directions to hold a fitness hearing pursuant to Proposition 57. Because the issue has divided the Courts of Appeal, and the dispute will eventually be resolved by our Supreme Court, I add just a few observations on the issue of retroactivity of Proposition 57.

In recent years, Propositions 36 and 47 made significant changes in criminal law and procedure. Both initiatives contained express retroactivity provisions, putting the electorate on notice that the proposed changes would affect final and non-final judgments. Proposition 57, on the other hand, is completely silent in its text and the voters' guide on the issue of retroactivity. The electorate had no reason to believe that a person in defendant's position—duly charged under existing law, convicted by jury, and sentenced—would retroactively be entitled to a fitness hearing. If the proponents of Proposition 57 intended retroactive application of its terms, they should not have

kept that intent hidden from the electorate. Perhaps voters would have been amenable to retroactive application of Proposition 57. "But voters can make that choice only if the question is presented in the initiative on which they have been asked to vote. The question was not presented" in Proposition 57, "and so it is not a choice we can say the voters have already made." (*People v. Valencia* (2017) 3 Cal.5th 347, 386 (conc. opn. of Kruger, J.).)

Not only is there no express retroactivity provision, there is no reason to conclude the voters impliedly intended Proposition 57 to apply to someone in defendant's situation under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*). I doubt that the reasoning of *Estrada* applies here, as the statutory punishment for second degree murder and use of a firearm (or any other offense) was not mitigated by Proposition 57. But beyond that, the suggestion that the voters must have intended retroactive application of any ameliorative provisions of Proposition 57 under *Estrada* is a fiction with which I cannot agree. It is not a stretch to conclude that the electorate as a whole has no knowledge or understanding of the principle of *Estrada*, particularly since the justices of the Courts of Appeal are divided on both the scope of the *Estrada* holding and its application to the issue presented here.

This brings me to my final point. There is no way to comply with Proposition 57 as to defendant. As amended by Proposition 57, Welfare and Institutions Code section 707, subdivision (a)(1), requires the prosecutor to make a motion

2

to transfer the minor from juvenile court to a court of general jurisdiction "prior to the attachment of jeopardy." Jeopardy attached long ago in this case. There is nothing in the language of Proposition 57 authorizing a fitness hearing after a conviction by jury and sentencing by the trial court. Proposition 57's requirement that a transfer motion be made "prior to the attachment of jeopardy" is an indication of the intent of the initiative. Liberal construction of Proposition 57 is required, but application of it to a circumstance never disclosed to the electorate and temporally impossible, in my view, goes beyond what may reasonably be read into the initiative by way of liberal construction. (See *People v. Estrada* (July 24, 2017, S232114) __Cal.5th__ [noting that Proposition 36 did not explicitly address the issue presented but intent is found in other factors].)

I would affirm the judgment in its entirety.


KRIEGLER, Acting P.J.

3